SOUTHERN SURETY COMPANY *v.* CALVERLY, ADMINISTRATOR.

[No. 23,922.   Filed April 30, 1924.   Rehearing denied October 10, 1924.]

1. APPEAL.—*Review.*—*Weight of Evidence.*—On an appeal from the trial court the Supreme Court will not pass on the weight of the evidence, so far as it is in conflict.   p. 252.

2. BAILMENT.—*Non-Negotiable Bonds.*—*Use as Collateral.*— *Special Contract.*—*Wrongful Transfer by Bailee.*—*Third Party's Right to Possession.*—Where non-negotiable bonds were loaned without other consideration than that the lender should continue to receive the interest on them and that they should be used as collateral only at Indianapolis, and should be returned on demand, and various demands were made and the borrowers after paying off the loan at Indianapolis and receiving back the bonds then delivered them without the owner's knowledge to a trust company at South Bend as collateral for a new loan, and the trust company in accordance with certain agreements with the borrowers later delivered the bonds to a surety company, whose vice-president, then man-

Southern Surety Co. *v.* Calverly, Admr.—195 Ind. 247.

aging its business in connection with these matters was told by the owner of the bonds, before the delivery of the bonds to the surety company that he was the real owner, the surety company never acquired any right to their possession.   p. 252.

3.   BAILMENT.—*Damages.*—*Interest on Bonds.*—Damages were not excessive when interest was allowed from the last interest paying date preceding the demand for the return of bonds loaned under a special contract of bailment instead of from the date of demand, when the evidence showed that under the terms of the agreement the owner was entitled to receive the accruing interest as it was paid annually, and that he did receive it down to the time of the last interest paying date before the demand was made, but not thereafter.   p. 253.

4.   TRIAL.—*Instructions to Jury.*—*Form.*—*Partial Enumeration of Facts.*—An instruction directing a verdict should be refused unless it correctly enumerates all the facts in issue on which the right to a directed verdict depends of which there is any evidence.   p. 253.

5.   TRIAL.—*Instructions to Jury.*—*Partial Omission of Facts.*— An instruction to the jury to find for the defendant in an action brought to replevy certain bonds given to the defendant as collateral security for a debt, if the debtor which borrowed them from the plaintiff before turning them over to the defendant had paid or advanced the plaintiff any sums of money of which any part remained unpaid at the time the plaintiff brought the action, was properly refused, because it would not have left to the jury any question whether or not the money was paid as a consideration for the use of the bonds, whether or not it was a loan, or was paid pursuant to an agreement to repay it, or whether it might merely have been the proceeds of interest coupons collected by the debtor and turned over to the plaintiff as owner.   p. 253.

6.   EVIDENCE.—*Opinion of Lay Witness.*—*Qualification.*—*Discretion of Court.*—In an action to replevy assessment bonds the court did not abuse its discretion in allowing a lay witness to testify to the value of the bonds at the time demand was made for their return, when witness had previously testified that he had lived in the town where the bonds were issued when the improvements were made and the bonds issued and continuously thereafter until time of trial, ten years later, except for a short time when he was living in a nearby city, that he was acquainted with the improvements, the value of the properties along the line of the improvements and that the plaintiff had put in the improvements.   p. 254.

7.   EVIDENCE.— *Non-Professional Witness.*— *Opinions.*— *Weight of Opinion for Jury.*—A non-professional witness, having per-

sonal knowledge of property and of facts tending to affect its value, may be permitted to give his opinion as to the value, but the weight to be attached to the opinion is for the jury to determine.   p. 254.

From Elkhart Superior Court; *William B. Hill,* Judge.

Original action of replevin by Hugh O'Donnell against the Southern Surety Company.   From a judgment for William F. Calverly, administrator of the estate of Hugh O'Donnell, deceased, the defendant appeals. *Affirmed.*

*Orion L. Reder, Deahl & Deahl* and *Louis M. Hammerschmidt,* for appellant.

*John G. Yeagley, Arthur L. Gilliom, Harry R. Lewis* and *Arnold J. Padgett,* for appellee.

EWBANK, C. J.—Appellee's decedent sued to replevin fifty special assessment improvement bonds, of the aggregate face value of $11,900, issued by the city of Bridgeport, Illinois.   While the cause was pending several of the bonds matured and were paid to appellant, and appellee recovered judgment for the face of the bonds, with interest, in the total sum of $15,460.10. Overruling the motion for a new trial is assigned as error, under which appellant complains of the refusal to give a requested instruction and the admission of certain evidence, and insists that the verdict is not sustained by sufficient evidence and is contrary to law, and that the damages are excessive.

It was shown without dispute that appellee's decedent was the owner of the bonds, that they were not negotiable by the law merchant, but were payable only out of special assessments, and that appellant received them as collateral security for a debt of Stewart, Sheets and Company, a partnership consisting of said decedent's

father-in-law and another man to whom decedent had loaned them, and that demand was duly made before suit. There was evidence (not undisputed) to the effect that they were so loaned on May 6, 1913; that at that time the partnership executed a receipt for them which certified that the said partners "have in their possession $13,000 in Bridgeport Special Assessment bonds belonging to Hugh O'Donnell (appellee's de-. cedent) which are to be delivered to said Hugh O'Donnell on demand without charge"; that the partners were contractors for the construction of a sewer in Vincennes, Indiana, and appellant was the surety on their bond; that O'Donnell was the son-in-law of one of the partners, and was employed by the partnership; that they asked him to "let them have the bonds to put up at Indianapolis to secure a loan," and he said he would and brought them the bonds; that they agreed to pay the interest on the bonds at what the bonds were drawing, and to keep them intact and return them to. O'Donnell, and promised to return them when they got a settlement with the trust company at Indianapolis from which the loan was obtained, representing that said partners had a balance of $45,000 coming to them; that an officer of the appellant company who was managing its business at Vincennes and South Bend knew the bonds belonged to O'Donnell, the son-in-law; that later in the same month O'Donnell asked for the return of his bonds, and again asked to have them returned five months later, but each time was told that they were still down at Indianapolis, "tied up," and that O'Donnell did not know that they had passed into the possession of anybody else than the trust company at Indianapolis until nearly two years had elapsed; that within five or six weeks after the bonds were loaned by O'Donnell to the partnership and used by it as security for a loan from the trust company at Indianap-

olis (on June 11, 1913), the partners obtained a new loan from a trust company of South Bend, and paid off the Indianapolis loan, and the bonds were delivered to the trust company at South Bend as collateral for the new loan, and the partners at that time executed a writing by which they agreed that the bonds should be so deposited as collateral security; that within four months thereafter the appellant company, which had also become surety for the partners on a second contract, made them a new loan, part of which was paid on their debt to the trust company at South Bend, and that the partners then delivered to the trust company at South Bend a written notice that the appellant company should "have a lien on all funds and bonds coming into your hands in excess of the amount necessary to pay off the note of $25,000 due you and the amounts advanced by you," and the trust company at South Bend acknowledged, under date of September 26, 1913, the receipt of such order, and then agreed in writing that said "order and assignment is prior and superior to any other orders, claims, assignments or demands against said funds, security and collateral," except what was then due itself; that thereafter a vice-president of appellant company who was managing its business in connection with these matters was told by Hugh O'Donnell that the Bridgeport bonds which the partnership had put up as collateral belonged to him, and subsequently the bonds were delivered to appellant by the trust company at South Bend; that when the bonds were first delivered to the trust company at Indianapolis it tore off the interest coupons for the preceding year, which still remained unpaid, and the partners collected the money due on them, in the sum of $650 and paid to Hugh O'Donnell that amount by check; and that the entire contract under which the bonds were delivered to the partnership consisted of a request by the partners that

O'Donnell would loan them the bonds to use as collateral for a loan from the trust company at Indianapolis, his reply "all right," the statement in that conversation that the partners were to pay interest on the bonds at what the bonds were drawing, that the bonds were to be kept intact and to be returned to him from the trust company; and that the next morning O'Donnell brought the bonds to the office, when the receipt above set out was executed, and that one of the partners took the bonds to Indianapolis; that while $13,000 of bonds were delivered by O'Donnell to the partners, only $11,900 of them were in the possession of appellant at the time demand was made. But it was not shown how the amount was reduced, nor when. And it was shown without dispute, that the bonds were payable in a series, and that more than $4,000 of them had matured and were paid off in the first four years after they were loaned, and that $10,000 had matured and been collected by appellant, both principal and interest, when the cause was tried in May, 1920, seven years after they were loaned, and that all of them were issued June 1, 1910, each being payable on the first day of June of some subsequent year, with five per cent. interest, payable annually.

This evidence is sufficient to sustain the verdict. The Supreme Court will not pass on the weight of the evidence, so far as it is in conflict, and if the bonds 1, 2. were loaned, without other consideration than that the lender should continue to receive the interest on them, and the borrowers agreed that they should be used as collateral only at Indianapolis, and should be returned on demand, and appellant received them as stated above, it never acquired any right to their possession. One of the partners testified that at the time the bonds were loaned by O'Donnell he stipulated that he would need some money a month or so

later to buy a car, and that the next month or the month following the partners gave him a check for something like $1,700 (he did not remember the exact sum), in addition to a check for $650 for the interest collected on the coupons. But the jury may not have believed his testimony, or may not have inferred therefrom that the partners agreed to and did loan the owner of the bonds $1,700 in consideration of the use of the bonds. It was disputed by much other evidence.

Appellant complains that the damages are excessive because the jury allowed interest from the last interest paying date preceding the demand for possession of the bonds, instead of only allowing it from the date when the demand was made. The evidence was that a part of the agreement under which the bonds were loaned was that the owner should receive the accruing interest as it was paid annually, and that he did receive each installment down to the time of the last interest paying date before the demand was made, but there was no evidence that any interest was paid for the months intervening between the last date when the city of Bridgeport paid interest on the bonds, and the time when demand for the bonds was made the following spring. The plaintiff was clearly entitled to interest for this period, and the verdict is not excessive.

Appellant complains of the refusal to give an instruction which it tendered, as follows (Our italics): "If you find from a fair preponderance of the evidence in this cause that Stewart, Sheets & Company *paid or advanced* to Hugh O'Donnell the sum of $1,700, *or any other amount of money,* and the same or any part thereof remained unpaid at the time plaintiff brought this action to replevin said bonds, *then plaintiff cannot recover and your verdict should be for the defendant,* The Southern Surety Company." In

form this was a binding instruction by which the jury were to be directed to return a verdict for the defendant if they should find the few facts enumerated. Such an instruction should be refused unless it correctly enumerates all the facts in issue on which defendant's right to a verdict depends, of which there is any evidence at all. Appellant seeks to construe it as a direction that if the parties agreed that a sum of money should be loaned by the partnership to O'Donnell for his use while they had his bonds, as a consideration for the loan of the bonds, and he received from them a sum of money under that agreement which he was to repay he would not be entitled to recover possession of his bonds until he should have repaid the money so advanced. But the instruction is not limited to a direction to that effect, and we need not consider and do not decide whether or not it would be correct under the facts of this case if it did. As requested it would not have left to the jury any question whether or not the money was paid as a consideration for the use of the bonds, whether or not it was a loan, or was paid pursuant to an agreement that it should be repaid, or whether "any other amount of money" referred to might have been merely the proceeds of interest coupons cut from the bonds and collected by the partnership, and then paid to the owner. It was not error to refuse the instruction, reading as it did.

The undisputed evidence showed that the bonds in question were issued in 1910 by the city of Bridgeport in payment for street improvements, that they 6, 7. were payable solely out of assessments against the property benefitted, and that they bore interest at the rate of five per centum, payable annually; that at the time demand was made the accrued interest and more than one-third of the principal had been

paid, and that at the time of the trial all of the accrued interest, and all of the principal that had matured, to the amount of nearly six-sevenths of it, had been paid. A witness who testified that he lived in Bridgeport in 1910, when the improvement was made and the bonds issued, and continuously thereafter until the time of the trial, in 1920, except for a while in 1912 to 1915, when he lived in another city near by, where he was at work, and that he was acquainted with the improvements made there in the way of building streets, and with the property along the line of those improvements, and the values of the properties assessed for them, and knew that Hugh O'Donnell and his brothers put in the improvements, was permitted, over objection, to testify as to the value of the bonds in the spring of 1915, when the demand was made. The trial court did not abuse its discretion in admitting this testimony upon such a preliminary showing. A nonprofessional witness having knowledge of property and of facts tending to affect its value may be permitted to give his opinion as to such value, the weight of the opinion being for the jury, upon the facts previously stated by the witness, and any that may be brought out on cross-examination. *Graves, Admr.,* v. *Pemberton* (1891), 3 Ind. App. 71, 73, 29 N. E. 177; *Terre Haute, etc., R. Co.* v. *Crawford* (1885), 100 Ind. 550, 556.

The judgment is affirmed.

Myers, J., absent.